Tagged Opinion



**ORDERED in the Southern District of Florida on December 29, 2010.**

_____

**Robert A. Mark, Judge**
**United States Bankruptcy Court**

_____

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

_____ )
In re:                               )      CASE NO. 09-20334-BKC-RAM
                                     )      CHAPTER  7
ROYAL WEST PROPERTIES, INC.,         )
                                     )
          Debtor.                    )
_____ )

### MEMORANDUM OPINION AND
### FINAL ORDER ON TRUSTEE'S AMENDED
### <u>GENERIC OBJECTIONS TO INVESTORS' SECURED CLAIMS</u>

This Chapter 7 case includes hundreds of individual creditors who invested money with the Debtor and purportedly received assignments of individual notes and mortgages to secure the Debtor's obligations to them.  The case has spawned substantial litigation over the validity of the secured claims filed by the investors.  This opinion and Order will resolve the remaining legal issues raised in the Chapter 7 Trustee's Amended Generic Objections to Investors' Secured Claims (the "Generic Objection") [DE# 330].

1

## **Factual Background**

Royal West Properties, Inc. ("Debtor") is a Florida corporation owned and controlled by Gaston E. Cantens and his wife, Teresita Cantens. For over twenty-five years, the Debtor was engaged primarily in the business of (a) acquiring, owning, selling, and financing the sale of vacant real estate lots ("Lots"), typically one-quarter to one-half acre in size, primarily located in Collier County, Charlotte County and Lee County, Florida and (b) servicing the notes and mortgages generated from the sale of the Lots.

The Debtor sold the Lots for approximately $10,000 to $50,000 ("Purchase Price") per Lot to customers (the "Lot Purchasers"). The Debtor typically financed the Lot Purchasers' purchase of Lots by accepting purchase money notes and mortgages for a substantial portion of the Purchase Price. In fact, to encourage sales, the Debtor would often finance the Purchase Price with little or no money down. The Lot Purchasers issued a promissory note ("Mortgage Note") to the Debtor for the amount financed and granted a mortgage ("Mortgage") to the Debtor encumbering the purchased Lot. The Mortgage Notes and Mortgages are collectively referred to in this Opinion as the "Mortgage Receivables."

In order to raise capital to finance its real estate business, the Debtor solicited investors ("Investors") to loan money to the Debtor. These loans ("Investor Loans") were evidenced by a promissory note issued by the Debtor to the Investor ("Investor Note"). The Debtor solicited Investor Loans by purportedly offering the Investors a high interest rate and by providing security to the Investors to secure the obligations. Specifically, the Debtor's obligations under many of the Investor Notes were purportedly secured by an assignment of certain Mortgages ("Assignment") which the Debtor held from the sale of its Lots to the Lot Purchasers.

2

Some of the Assignments were recorded in the public records of the county where the Lots encumbered by the Mortgages were located.  On their face, the Assignments appear to be a "sale" of the Mortgages, but in fact, the parties did not intend the Assignments to be an absolute sale of the Mortgages.  Rather, the parties intended the Assignments to be collateral assignments of the Mortgages to secure repayment of the Investor Notes.  The Court's legal conclusion on the nature of the Assignments is set forth in the Court's December 28, 2009 Order Granting Trustee Dillworth's Motion to Determine Nature and Extent of Investors' Interests in Mortgage Receivables (the "December 28th Order") [DE# 299].  That Order and the contested matter resolved by the Order are discussed in more detail later in the Opinion.

Based upon Trustee Dillworth's review of the Debtor's records, nearly all cash received by the Debtor, whether from the payment of a Mortgage Receivable, sale of a Lot in inventory, or from an Investor Loan, flowed through a single Debtor operating account.  Also, nearly all payments to Investors and ordinary course of business creditors were made from that same operating bank account.  The Debtor paid obligations owed to Investors without regard to whether the Debtor was receiving payments on a Mortgage Note assigned to an Investor.  Particularly, more recently after the real estate market collapsed, the Debtor used the proceeds from new Investor Loans to fund the Debtor's general business obligations and make payments due on old Investor Loans.

At various court hearings in this case, the Chapter 7 Trustee has alleged that the Debtor was operated as a Ponzi scheme for a significant period prior to the filing of the bankruptcy case.  Whether or not the business activities fit that description, the end result is clear.  Unpaid Investor Loans greatly exceed the value of the assets in this estate.

3

### Debtor's Bankruptcy Case

On May 27, 2009 ("Petition Date"), three creditors of the Debtor filed an involuntary petition under Chapter 11 against the Debtor.  On June 29, 2009, the Debtor filed an Emergency Motion for the Appointment of Trustee (the "Trustee Motion") [DE# 12], which included the Debtor's consent to entry of an Order for Relief.  On July 1, 2009, the Court entered the Order for Relief [DE# 15] and an Order granting the Trustee Motion [DE# 16].  On August 10, 2009, the Court entered an Order [DE# 68] converting this case to a Chapter 7 case, and on August 12, 2009, the U.S. Trustee's Office appointed Trustee Dillworth as the Chapter 7 Trustee [DE# 72].

An overwhelming majority of the debt in this case is owed to the Investors who loaned money to the Debtor over the course of the last fifteen years.  As of the Petition Date, the  principal amount due to Investors exceeded $47 million.

The Debtor's assets include approximately 750 separate Mortgage Receivables encumbering approximately 950 Lots sold by the Debtor to its customers, the Lot Purchasers.  As of the Petition Date, the unpaid balance of the Mortgage Receivables owed to the Debtor by Lot Purchasers was approximately $17 million.

When Trustee Dillworth was appointed, the Debtor's business operations had effectively collapsed under the weight of the $47 million due the Investors.  The Debtor's financial condition was further impacted by a deteriorating real estate market resulting in a limited demand for the remaining Lots in the Debtor's inventory and by the increasing percentage of Mortgage Receivables which had become non-performing.

### Prior Contested Matters to
### Determine Validity of Secured Claims

4

To administer this case, Trustee Dillworth needed first to establish that the Mortgage Receivables were property of the estate assigned as collateral to the Investors, not assets that were absolutely assigned to the Investors. Second, if the Mortgage Receivables were assigned as collateral, the Trustee needed to determine which Investors had perfected their security interests.

The first and a portion of the second issue were resolved in the Court's December 28th Order, referred to earlier. That Order granted Trustee Dillworth's Motion to Determine Nature and Extent of Investors' Interests in Mortgage Receivables which was filed on September 3, 2009 (the "Trustee's First Omnibus Motion") [DE# 111]. The December 28th Order contained the following legal conclusions which determined the status of many of the Investor claims:

A.    The Assignments of the Mortgage Receivables were collateral assignments to secure repayment of the Investor Notes, not absolute assignments which transferred ownership of the Mortgage Receivables to the Investors. Therefore, on the Petition Date, the Mortgage Receivables were property of the estate;

B.    To have a valid, enforceable security interest in an assigned Mortgage Receivable, an Investor had to perfect its security interest under the applicable provisions of Florida's Uniform Commercial Code ("UCC"). Recording the Assignments in accordance with the real estate recording statutes was not sufficient; and

C.    To perfect under the UCC, an Investor had to either file a UCC-1 financing statement under Fla. Stat. §679.3121(1), or have possession of the original Mortgage Note which perfects the security interest under Fla. Stat. §679.3131(1). A perfected security interest in the Mortgage Note automatically perfects a security interest in the corresponding

5

Mortgage under Fla. Stat. §679.3081(5).

The conclusions in the December 28th Order carried the Trustee a good way down the road in determining which Investors held perfected security interests in the Mortgage Receivables on the Petition Date. Still, a host of different factual scenarios generated additional legal issues which remained unresolved. These issues, more particularly described below, were framed in certain stay relief motions filed by Investors (the "Investor Stay Relief Motions")[1] and in the Generic Objection.

The Generic Objection addressed the following four general categories of remaining issues related to the Investor claims:

A.    How to deal with postpetition proceeds derived from Mortgage Receivables in which Investors have perfected security interests including, in particular, the Trustee's request to retain a portion of the proceeds as reimbursement for the expenses of collection;

B.    Situations where the Lot Purchasers no longer had title to the Lots subject of the Assignments. These included situations in which the Debtor foreclosed and took back title or obtained title by accepting a deed in lieu of foreclosure;

C.    Situations in which the Debtor assigned a Mortgage Receivable, but never closed on the sale of the Lot subject to the Mortgage Receivable; and

D.    Situations in which the Mortgage Receivable was compromised or settled by the Debtor and Lot Purchaser resulting in the Debtor releasing the Lot Purchaser from any remaining obligations under the Mortgage Note.

---

[1]    The stay relief motions are listed on page 5, n. 6, of the Court's March 16, 2010 Order Granting in Part and Reserving Ruling in Part Trustee Dillworth's Amended Generic Objections to Investors' Secured Claims [DE# 411].

Several Investors filed responses to the Generic Objection.  The issues were also addressed in the Investor Stay Relief Motions referenced earlier and in memoranda filed by the Trustee in response to those motions.

Following a hearing on February 23, 2010, the Court entered its March 16, 2010 Order Granting in Part and Reserving Ruling in Part Trustee Dillworth's Amended Generic Objections to Investors' Secured Claims (the "March 16th Order") [DE# 411].  The March 16th Order resolved some but not all of the issues raised in the Generic Objection and the Investor Stay Relief Motions.  The rulings are summarized as follows:

1.      Relying on the equity exception in 11 U.S.C. §552(b)(1), the Court ruled that the Trustee could retain 50% of all proceeds collected after the Petition Date on Mortgage Receivables subject of perfected security interests.

2.      The Court ruled that no Investor could hold a perfected security interest in a Mortgage Receivable if the sale of the Lot never closed.  The reasoning on this issue was simple.  Because the Lot Purchaser never closed on the purchase of the Lot, there never was an actual Mortgage Receivable on that Lot.  Thus, no collateral actually was assigned by the Debtor to the Investor in connection with that purported Lot purchase.

The March 16th Order reserved ruling on the remaining issues raised in the Generic Objection and Investor Stay Relief Motions.  Those issues, which are addressed in this Memorandum Opinion and Order, are the following:

A.      Did the Debtor have the authority to compromise, release or sue on the Mortgage Receivables which were assigned to Investors, including taking back deeds in lieu of foreclosure, without the consent of the Investors who had perfected security interests in those Mortgage Receivables?

7

B.      Where the Debtor took back title to Lots through foreclosure or receipt of deeds in lieu of foreclosure (the "Reacquired Lots"), did an Investor's perfected security interest in the Mortgage Receivable attach to the Reacquired Lot as "proceeds" of the Mortgage Receivable?

C.      If the Investor's lien on the Mortgage Receivable is not a lien on the Reacquired Lot which is perfected under the UCC, is the Investor entitled to imposition of an equitable lien or a constructive trust on the Reacquired Lot?

D.      Even if an Investor can prove entitlement to an equitable lien or constructive trust, does the power granted to the Trustee under the strong-arm provisions in 11 U.S.C. §544(a) permit the Trustee to retain title to these Reacquired Lots, free and clear of an Investor's equitable lien or constructive trust claim?

### Discussion

Although complicated by an unusual set of facts, this dispute is, at its core, the quintessential struggle between a bankruptcy trustee attempting to maximize the value of the unencumbered assets for the benefit of unsecured creditors and creditors seeking greater recovery by establishing secured claims.  The secured claims that remain at issue are not claims secured by the assigned Mortgages.  That is so because the assigned Mortgages were discharged when the Debtor took back title to the underlying Lots through foreclosure or deed in lieu of foreclosure. *See Prigal v. Kearn*, 557 So. 2d 647, 648 (Fla. 4th DCA 1990) ("[I]f a borrower returns his interest in mortgaged property to the lender, such a transfer operates as a merger of the two estates of interests, the lender is vested with complete title and any rights that he formerly held under the mortgage are terminated. The merger results in a discharge of the mortgage and a satisfaction of the debt." (citations

8

omitted)).  Thus, the issue now is whether the Investors whose Investor Notes were previously secured by the assigned Mortgages have a perfected security interest in or enforceable equitable claim against the Reacquired Lots.

The Investors advance various arguments in support of their alleged security interest in the Reacquired Lots.  The first batch of arguments is legal argument based on application of the UCC.  Those arguments flow from the basic premise that, without the express consent of the Investors, the Debtor could not extinguish a security interest in Mortgage Receivables that was perfected prepetition.  They argue that their perfected security interests attached to the Reacquired Lots as "proceeds" of the assigned Mortgages.  The Trustee counters that the Debtor extinguished the Investors' security interests by consenting to the extinguishment as the Investors' agent.  Moreover, even if the security interests initially attached to the Reacquired Lots, the Trustee argues that perfection lapsed because the Investors failed to re-perfect their security interests as required by the UCC.

Alternatively, the Investors urge the Court equitably to grant them the equivalent of a perfected security interest by imposing an equitable lien or constructive trust on the Reacquired Lots.  The Trustee counters that his avoidance powers would prime any equitable lien or constructive trust claim the Investors may have had on the Petition Date.

After a thorough review of the facts and the law, the Court finds the Trustee's arguments persuasive and concludes that the Investors do not have perfected security interests in or enforceable equitable claims against the Reacquired Lots.

I.     **The Debtor had the Authority to Compromise or to
Enforce the Mortgage Receivables and to Reacquire
the Lots through Foreclosure or Deeds in Lieu of Foreclosure**

Determining whether the Debtor had the authority to compromise, release or sue on the Mortgage Receivables may be dispositive because such authority would extinguish the Investors' security interests in the Mortgage Receivables.  Pursuant to section 679.3151 of the Florida Statutes, "[a] security interest . . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof *unless the secured party authorized the disposition free of the security interest.*" Fla. Stat. Ann. §679.3151(1)(a) (West 2010) (emphasis added).  Moreover, the "security interest attaches to any identifiable proceeds of collateral." Fla. Stat. Ann.  §679.3151(1)(b) (West 2010).   Thus, if the Investors authorized the Debtor to dispose of the Mortgage Receivables, the Investors' claims against the Debtor's bankruptcy estate would not be secured by the Mortgage Receivables or any proceeds, in particular, the Reacquired Lots.

The essential facts regarding the Debtor's authority to enforce the Mortgage Receivables are not in dispute.  The Debtor did not request permission to compromise, release or sue on the Mortgage Receivables, and, therefore,  the Investors never expressly consented to the Debtor's disposition of the Mortgage Receivables.  The parties disagree as to whether the Debtor had the actual or implied authority to dispose of the Mortgage Receivables absent the Investors' express consent.

There is no evidence of a servicing agreement between the Debtor and the Investors, but the conduct of the parties demonstrates that the Debtor had the authority to dispose of the Mortgage Receivables free and clear of the Investors' security interest.  The Court has already found the following facts alleged by the Trustee to be true and uncontroverted: (i) the Investors did not communicate with the Lot Purchasers, (ii) the

10

Investors did not collect payments on the Mortgage Receivables, (iii) the Investors did not confirm payment of taxes or insurance on the Lots, and (iv) the Debtor continued to act as the owner and holder of the Mortgage Receivables post-assignment. *See* December 28th Order, p.2 (finding that "[n]one of the Respondents, either in their written Responses or at the Hearing, challenged or raised any material issue of fact or law as to Trustee Dillworth's position"). In sum, with no objection by the Investors, the Debtor assumed full responsibility for collecting and enforcing the Mortgage Receivables.

The only written evidence of any agreement between the Investors and the Debtor regarding enforcement of the Mortgage Receivables is the document titled "Mortgage Investments"[2] that the Debtor used to solicit investments. That document states that the Debtor's assignment of a Mortgage Note is with recourse to the Debtor to "PROTECT THE INVESTOR IN THE EVENT A BUYER WHO BOUGHT AND FINANCED A PROPERTY STOPS PAYING. ROYAL WEST PROPERTIES IS BOUND TO BUY BACK THIS PROMISSORY NOTE FROM THE INVESTOR FOR THE BALANCE OWED AT THAT TIME." The Court finds that this language means that when a Mortgage Receivable became nonperforming, the Investor had a claim against the Debtor for the balance due on the Mortgage Receivable. Essentially, the Debtor was obligated to "buy back" the secured claim against the Lot Purchaser. The Debtor's failure to perform its obligation, coupled with the Debtor's extinguishment of the assigned Mortgages, left the Investors with unsecured claims on the Petition Date.

---

[2]     A copy of the "Mortgage Investments" document is attached as Exhibit "C" to the Trustee's First Omnibus Motion  [DE# 111].

11

The Court finds that the totality of the evidence before it supports a finding that the Debtor could dispose of the Mortgage Receivables free of the Investors' interest, as does the applicable law of agency. *Scott v. Taylor*, 58 So. 30, 32 (Fla. 1912) ("The maker of a negotiable promissory note can satisfy it only by payment to the owner at the time of such payment, *or to such owner's authorized agent.*" (emphasis added)). A discussion of agency law follows.

The Trustee argues that because the Debtor serviced the Mortgage Receivables directly and without any input from or involvement by the Investors, the Debtor was the *de facto* agent of the Investors and, through this agency relationship, had the implied  actual authority to negotiate the Mortgage Receivables. In support of his argument, the Trustee cites several cases with similar fact patterns in which mortgage brokers who originated a note and mortgage assigned the note and mortgage to an assignee, but continued to service the note and mortgage for the assignee. In these cases, upon the sale of the property encumbered by the mortgage, the assignor/mortgage broker received from the sales proceeds the balance due on the note and released the mortgage, but failed to remit the balance due to the assignee. Often, the purchaser in these cases had no notice or knowledge of the assignment. In all of these cases, the courts rejected claims by the assignee, finding that the purchaser acquired title to the property free of any liens or claims of the assignee because the assignor, as agent of the assignee, had authority to accept payment on the mortgage debt, including final payment of the entire balance outstanding. *See, e.g., Skott v. Bank of America Illinois*, 468 S.E.2d 359 (Ga. 1996); *United Missouri Bank, N.A. v. Beard*, 877 S.W.2d 237 (Mo.  W.D.Ct. App. 1994); *Gordon v. Tobias*, 817 A.2d 683 (Conn. 2003).

12

The facts of this case are distinguishable, including the fact that the Mortgage Receivables here were never satisfied. Rather, the Mortgages were released when the Debtor acquired title to the Reacquired Lots through foreclosure or acceptance of deeds in lieu of foreclosure. Nevertheless, the Court concludes that the result is the same.

Like the assignees of the notes and mortgages in the above-cited cases, the assignees in this case, namely, the Investors, did nothing to police their investment. Certainly, the Lot Purchasers had reason to believe that the Debtor had the authority to compromise or to enforce the Mortgages. The Debtor sold them the Lots, took back the Mortgage Notes and Mortgages, and collected payments on the Mortgage Receivables. As such, it was perfectly reasonable for the Lot Purchasers to believe that the Debtor also had the authority to negotiate settlements releasing them from liability under the Mortgages, to sue them to foreclose the Mortgages or to release the Mortgages in exchange for a deed in lieu of foreclosure. The Investors did nothing to limit the Debtor's ability to take these actions.

More importantly, the Investors expressly consented to simply having a claim against the Debtor in the event an assigned Mortgage Receivable became nonperforming. The Debtor's authority then to enforce the Mortgage Receivable through suit or settlement for its own accountant is implicit. As a result, the Debtor was, for all intents and purposes, the Investors' agent with implied actual authority to dispose of the Mortgage Receivables.

Although the Court has determined that the Debtor had the authority to dispose of the Mortgage Receivables free of the Investors' security interests, the Court nevertheless will address whether the Investors could establish either a legal or equitable basis for

asserting secured claims against the Reacquired Lots.  The legal and equitable arguments are discussed in the following sections of the Opinion.

## II.   The Investors Do Not Have Perfected Security Interests in the Reacquired Lots

When a borrower converts a secured lender's collateral, Article 9 of the UCC, as enacted in chapter 679 of the Florida Statutes, protects the lender by providing for a continuing security interest in the collateral *and* a substitute security interest in the proceeds obtained upon conversion of the collateral. Fla. Stat. Ann. §679.3151(1) (West 2010).  The Investors at issue in this Opinion have perfected security interests in the Mortgage Receivables because they possess the original Mortgage Notes.  Whether those Investors also have perfected security interests in the Reacquired Lots depends on (i) whether the Reacquired Lots are "proceeds" of the Mortgage Receivables and (ii) whether perfection of the Investors' security interests in the "proceeds" of the Mortgage Receivables lapsed prior to the Petition Date.  Both issues are determined by application of state law. *Butner v. United States*, 440 U.S. 48, 54-57 (1979).

## A.   The Reacquired Lots are Proceeds of the Investors' Collateral

The definition of "proceeds" in section 679.1021 of the Florida Statutes includes five categories of property, any one of which qualifies as "proceeds" of collateral.  The first category, "[w]hatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral[,]" best fits the facts of this case. Fla. Stat. Ann. §679.1021(1) (West 2010).  In its December 28th Order, the Court decided that the Mortgage Receivables are collateral.  Thus, if the Debtor's taking back title to the Lots through foreclosure or receipt of deeds in lieu of foreclosure is an exchange or other disposition of the Mortgage

14

Receivables, the Reacquired Lots are proceeds of the Mortgage Receivables under the UCC.

The plain meaning of "exchange" and "disposition," and even the legal meaning of "exchange" and "disposition," favors an interpretation of Fla. Stat. §679.1021 that brings the Reacquired Lots within the definition of "proceeds." *Black's Law Dictionary* defines "exchange" as "[t]he act of transferring interests, each in consideration for the other" and "disposition" as "[a] final settlement or determination." *Black's Law Dictionary* 484, 585 (7th ed. 1999). *See also Fed. Deposit Ins. Corp. v. Hastie (In re Hastie)*, 2 F.3d 1042, 1045 (10th Cir. 1993) (adopting the *Black's Law Dictionary* definitions of "exchange" and "other disposition" because the "definitions are consistent with the conventional usage of such terms" (citations omitted)); *but cf.* UCC §9-102 cmt. 13.a. (2001) (rejecting the ultimate holding of *Hastie* but not the Court's adoption of the *Black's Law Dictionary* definitions). Here, the Debtor exchanged a Mortgage Receivable by transferring its right to satisfaction of the Mortgage Receivable as consideration for a Lot Purchaser's transfer of title to the Debtor, particularly where title was taken by acceptance of a deed in lieu of foreclosure. Where the Debtor took back title to a Reacquired Lot through either foreclosure or receipt of a deed in lieu of foreclosure, the Debtor effected a final settlement of a Lot Purchaser's liability for a Mortgage Receivable and, therefore, disposed of the Mortgage Receivable.

The plain meaning of "exchange" and "disposition" notwithstanding, the Court found cases suggesting that the Reacquired Lots may not be "proceeds" of the Mortgage Receivables. *See, e.g., Nat'l Bank of Alaska, N.A. v. Erickson (In re Seaway Express Corp.)* 912 F.2d 1125, 1127 (9th Cir. 1990) (finding that a perfected security interest in an account receivable does not give rise to a perfected security interest in real property

accepted in settlement of the account receivable); *Silverberg v. Colantuno*, 991 P.2d 280, 289 (Colo. Ct. App. 1998) (the Court is "not aware of any authority indicating that a 'disposition' includes a release of collateral to its owner").  The Court finds no need to pursue these arguments further because, as discussed in the next section, any perfected security interest that an Investor initially may have had in the Reacquired Lots as "proceeds" of the Mortgage Receivables expired prior to the Petition Date.  Therefore, the Court will assume, without specifically finding, that the Reacquired Lots constitute "proceeds" of the Mortgage Receivables within the meaning of Fla. Stat. § 679.1021.

### B.    The Investors Failed to Perfect Their Security Interest in the Reacquired Lots

Upon the Debtor's acquisition of title to a Reacquired Lot, whether by foreclosure or receipt of a deed in lieu of foreclosure, an Investor's security interest in the Mortgage Receivable automatically attached to the Reacquired Lot as an "identifiable proceed" of the Mortgage Receivable. Fla. Stat. Ann. §679.3151(1) (West 2010).  The Reacquired Lot is an "identifiable proceed" because the Mortgage described the Lot with particularity.  An Investor's automatic security interest in the Reacquired Lot initially is a perfected security interest because the Investor's security interest in the Mortgage Receivable was perfected. Fla. Stat. Ann. §679.3151(3) (West 2010).  However, section 679.3151(4) of the Florida Statutes generally limits automatic perfection of a security interest in the identifiable proceeds of collateral to twenty days from the date of attachment.  Section 679.3151(4) provides:

A perfected security interest in proceeds becomes unperfected on the 21st day after the security interest attaches to the proceeds unless:

(a)    The following conditions are satisfied:

16

1.      A filed financing statement covers the original collateral;
2.      The proceeds are collateral in which a security interest may be perfected by filing in the office in which the financing statement has been filed; and
3.      The proceeds are not acquired with cash proceeds;

(b)    The proceeds are identifiable cash proceeds; or

(c)    The security interest in the proceeds is perfected other than under subsection (3) when the security interest attaches to the proceeds or within 20 days thereafter.

There are three exceptions to the general rule governing expiry of automatic perfection, none of which apply here.  Under subsection (a) of Fla. Stat. § 679.3151(4), an Investor's perfected security interest in a Reacquired Lot would be excepted from expiry if the Investor filed a UCC-1 financing statement covering the Mortgage Receivable in an office where the filing of a UCC-1 financing statement covering the Lot perfects a security interest in the Lot.  This subsection fails because the Investors with perfected security interests in the Mortgage Receivables perfected their interests by possession of the Mortgage Notes.  Even if the Investors had filed UCC-1 financing statements covering the Mortgage Receivables, subsection (a) fails because, under Florida law, filing a UCC-1 financing statement does not perfect an interest in real property. *See* Fla. Stat. Ann. §679.1091(4)(k) (West 2010) (specifically excluding from the scope of Chapter 679 "[t]he creation or transfer of an interest in or lien on real property").  The filing of the UCC-1 may perfect an interest in a mortgage encumbering real property, but not an interest in the underlying realty. *See* Fla. Stat. Ann. §679.1091(4)(k) (West 2010) (attachment of a security interest in a mortgage on real property under Fla. Stat. § 679.2031 and perfection of that interest under Fla. Stat. §679.3081 are within the scope of Chapter 679).

17

Subsection (b) of Fla. Stat. §679.3151(4) requires that the proceeds be "identifiable cash proceeds" and is inapplicable because real estate is not cash.

The Investors' security interests in the Reacquired Lots are not perfected under the last subsection of Fla. Stat. § 679.3151(4), subsection (c), because the only way to perfect an interest in Florida real estate is compliance with Florida's recording laws, and the Investors did not record their interests in the Reacquired Lots as required by chapter 695 of the Florida Statutes. Fla. Stat. Ann. §695.01(1) (West 2010) ("No conveyance, transfer, or mortgage of real property, or of any interest therein, . . . shall be good and effectual in law or equity against creditors or subsequent purchasers for a valuable consideration and without notice, unless the same be recorded according to law[.]").  Subsection (c) provides that perfection is continuous if achieved (i) other than by automatic attachment of a perfected security interest in collateral to identifiable proceeds under Fla. Stat. §679.3151 or (ii) within twenty days of automatic attachment under Fla. Stat. §679.3151.  While it is true that some Assignments were recorded, those Assignments establish interests in Mortgages only.  By releasing a Mortgage, the Debtor extinguished any interest an Investor may have had in the Mortgage.  If upon extinguishment of an Investor's interest in a Mortgage an Investor obtained, whether by law or in equity, an interest in the Reacquired Lot formerly encumbered by the Mortgage, the Investor is charged with recording some instrument indicating its interest in the Reacquired Lot.  Absent recording of a claim of lien, a lis pendens pending imposition of a constructive trust, or some similar instrument, automatic perfection lapses on day twenty-one.  To the Court's knowledge, no such instruments have been recorded.  Consequently, any security interest that an Investor may

18

have had in a Reacquired Lot as the "identifiable proceed" of a Mortgage Receivable is, at best, an unperfected security interest on the Petition Date.

### III.    The Trustee Holds Title to the Disputed Lots Free and Clear of Any Constructive Trust or Equitable Lien Claims

The Investors argue that the Reacquired Lots previously encumbered by the assigned Mortgages are subject to imposition of a constructive trust or equitable lien. They assert that equitable relief is appropriate because the Debtor's decision to foreclose or accept deeds in lieu of foreclosure extinguished the Mortgages thereby depriving the Investors of the collateral securing their Investor Notes. After review of Florida law, the Court concludes that the circumstances of these transactions could possibly support imposition of an equitable lien, but would not provide a basis to impose a constructive trust.

Under Florida law, a constructive trust "arises through operation of law. Where one through fraud, abuse of confidence, or other questionable means gains property which in equity or good conscience he should not be permitted to retain, equity will raise a constructive trust." *Hallam v. Gladman*, 132 So.2d 198, 204 (Fla. 2d DCA 1961) (citation omitted). Constructive trusts arise when a party is deprived of an interest in property through the defendant's wrongful and usually fraudulent conduct. The wrongdoing typically occurs in the transaction which deprived the plaintiff of its legal interest in the property. *See e.g., Malkus v. Gaines*, 434 So.2d 957 (Fla. 3d DCA 1983); *Johnson v. Johnson*, 349 So.2d 698 (Fla. 4th DCA 1977); *Traub v. Traub*, 102 So.2d 157 (Fla. 2d DCA 1958).

The facts in this case do not support imposition of a constructive trust. As discussed earlier, the Debtor had the authority to enforce the Mortgage Receivables, whether through collection, foreclosure, settlement of the Mortgage Notes, or the taking of deeds in lieu of

19

foreclosure.  In fact, there is no evidence that any Investor ever undertook negotiations or litigation with the Lot Purchasers to enforce the Mortgage Notes they held as collateral. Thus, since the Debtor had the authority to undertake these transactions, it did not engage in fraud or other wrongful conduct that could give rise to a constructive trust.  In sum, since the property subject of the constructive fraud claims, namely, the Reacquired Lots, was not obtained by wrongful conduct, there is no basis for imposition of a constructive trust under Florida law.  *See Abele v. Sawyer*, 750 So.2d 70, 74 (Fla. 4th DCA 1999) ("A constructive trust is imposed by operation of law as an equitable remedy ... where there is a wrongful taking of the property of another"); *Finkelstein v. Southeast Bank, N.A.*, 490 So.2d 976, 983 (Fla. 4th DCA 1986) (the "specific property must be the subject of an inequitable transaction").

The Trustee concedes and the Court recognizes that the Debtor's business ultimately became a Ponzi scheme and that Investors were defrauded into making their investments.  This does not mean, however, that enforcement of the Mortgage Notes was fraudulent.  The Debtor was simply acting, as it always did, as the collector and enforcer of the Mortgage Receivables.  Indeed, as described in the offering documents referred to earlier which the Debtor provided to Investors [Ex. C to DE# 111], the Debtor promised to pay the balance of any assigned Mortgage Note which went into default.  It made no representation to the Investors that they would be granted a lien on any Lots taken back by foreclosure or deed in lieu of foreclosure.

Some of the Investors also argued that the Debtor's property interest in the Reacquired Lots on the Petition Date was solely as legal title holder with the beneficial interest preserved for the Investors under §541(d) of the Bankruptcy Code.  That argument

20

fails for the same reasons the constructive trust argument fails.  As Florida courts have described, "[c]onstructive trusts are akin to an express trust in that a bifurcation of title occurs; bare legal title to the property is held by the possessor of the property while the beneficial interest is held by the person entitled to the property." *Provence v. Palm Beach Taverns, Inc.*, 676 So.2d 1022, 1025 (Fla. 4th DCA 1996) (citing *In re Shepard*, 29 B.R. 928 (Bankr. M.D. Fla. 1983)).  Thus, as here, where the facts do no support imposition of a constructive trust, the facts similarly do not support treating the Investors as holders of the beneficial interest in the Reacquired Lots under §541(d).

Even if an Investor could establish cause to impose a constructive trust on the Reacquired Lots, the constructive trust claim would be trumped by the Trustee's status as a bona fide purchaser under 11 U.S.C. §544(a)(3).  *In re Seaway Express Corp.*, 912 F.2d 1125 (9th Cir. 1990) (trustee as bona fide purchaser under §544(a)(3) prevailed over bank which claimed a constructive trust over the property); *In re Abrass*, 268 B.R. 665, 682 (Bankr. M.D.Fla. 2001) (concluding that the Eleventh Circuit intimated in its decision in *In re General Coffee Corp.*, 828 F.2d 699 (11th Cir. 1987) "that a trustee's powers as a bona fide purchaser of real property overpower the rights and interests of a constructive trust beneficiary").[3]

The facts and circumstances of the Debtor's transactions with the Investors probably also would  defeat a claim to impose an equitable lien on the Reacquired Lots, but the

---

[3]      In its Limited Response to Trustee's Generic Objections [DE# 362], one Investor, Royal Trust Mortgage Company, argued that its recorded assignment of mortgage would have put a potential bona fide purchaser on notice that the Lot had been encumbered by a mortgage which had been assigned.  The Court does not reach the issue of whether a recorded assignment of mortgage would defeat the Trustee's strong-arm power as a bona fide purchaser under §544(a)(3) because it would not change the result.  The facts in these transactions simply do not support imposition of a constructive trust.

Court is not prepared to rule as a matter of law that equitable lien claims would fail. Under Florida law, equitable liens may be imposed "by a court out of general considerations of right or justice as applied to the particular circumstances of a case." *Cohen v. New Jersey Div. of State Lottery ( In re Tsiolas)*, 236 B.R. 85,88 (Bankr. M.D.Fla. 1999). Unlike a constructive trust, the imposition of an equitable lien does not require proof of fraud, egregious behavior or reprehensible conduct. *Id.* at 89. Thus, even though the Debtor did not defraud the Investors by foreclosing or taking deeds in lieu of foreclosure from defaulting Lot Purchasers, the Investors could conceivably convince a court that general principles of equity would require the Reacquired Lots to be charged with an equitable lien in an amount representing some or all of the amounts still due when the Mortgages were extinguished. In any event, the relative strength or weakness of an equitable lien claim need not be resolved. Any equitable lien claim would be avoidable by the Trustee in the exercise of his rights under the strong-arm provisions in §544(a) of the Bankruptcy Code.

Section 544(a) of the Bankruptcy Code grants the Trustee certain rights and powers of lien creditors and purchasers upon the filing of a bankruptcy case. The statute provides:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by --
>
>> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could

have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

Under all three subsections of §544(a), any equitable lien claim of an Investor on the filing date would be avoidable by the Trustee. *See Tsiolas*, 236 B.R. at 89-90 (equitable lien avoidable by trustee as hypothetical judicial lien creditor pursuant to §544(a)(1)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. George*, 516 So.2d 1068 (Fla. 4th DCA 1987) (judgment lien has priority over equitable lien); *Blumin v. Ellis*, 186 So.2d 286, 295-96 (Fla. 2d DCA 1996) ("an equitable lien is superior to the right of all persons except bona fide purchasers for value, or subsequent valid lienholders, without notice").

None of the Investors opposing the Generic Objection obtained equitable lien judgments before the petition date or filed actions to impose equitable liens. Had the Investors done so, the result might have been different. *See Westburne Supply, Inc. v. Comm. Villas Partners, Ltd.*, 508 So.2d 431 (Fla. 1st DCA 1987) (purchaser of property not

protected from equitable lien claim when it acquired property with actual notice of subcontractor's suit to enforce its equitable lien).  Thus, the Trustee's strong-arm powers under §544(a) would trump any possible equitable lien claims existing when this bankruptcy case was filed.

### Conclusion

All or virtually all of the Investor creditors in this case believed they were holding Mortgage Receivables as collateral to secure the Debtor's obligation to pay the Investor Notes.  Unfortunately, based on the facts and applicable law, only some of the Investors actually had perfected security interests in the Mortgage Receivables.  In two prior Orders, the Court determined that (1) only those Investors who had possession of original Mortgage Notes had perfected security interests; and (2) no Investor could hold a perfected security interest in a Mortgage Receivable if the Lot sale never closed.

This Opinion narrows further the scope of secured claims.  Even though an Investor holding an original Mortgage Note had a perfected security interest in a Mortgage Receivable, that security was extinguished when the underlying Mortgage was extinguished.  This occurred when the Debtor settled the outstanding balance or took back title to the Lots subject of the assigned Mortgages through foreclosure or acceptance of a deed in lieu of foreclosure.  These Investors do not have perfected security interests in the Reacquired Lots and any equitable lien or constructive trust claims against the Reacquired Lots would be avoided or trumped by the Trustee's strong-arm powers under §544(a) of the Bankruptcy Code.  In short, with no remaining Mortgages, the Investors subject of this Opinion, like many of the other Investors who bargained for and believed they held collateral, are simply the holders of unsecured claims.

###

COPIES TO:

Harold D. Moorefield, Jr., Esq.
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33l30
(Counsel for Trustee)

Phillip M. Hudson, III, Esq.
ARNSTEIN & LEHR, LLP
200 South Biscayne Blvd., Suite 3600
Miami, FL 33131
(Counsel for Alicia and Manuel Rodriguez & RBI-2120 Real Estate, Inc.)

David Samole, Esq.
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
(Counsel for Royal Trust)

**(Attorney Moorefield is directed to serve a copy of this Order on all parties served with the Generic Objection)**